**GUTRIDE SAFIER LLP**
SETH A. SAFIER (State Bar No. 197427)
seth@gutridesafier.com
MARIE A. MCCRARY (State Bar No. 262670)
marie@gutridesafier.com
KALI BACKER (State Bar No. 342492)
kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 271-6469
Facsimile:  (415) 449-6469

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS CAMPOS, as an individual, on behalf of himself, the general public, and those similarly situated,<br><br>    Plaintiff,<br><br>        v.<br><br>HALEON US INC.; and ALACER CORP.,<br><br>    Defendants. | CASE NO.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT; FALSE ADVERTISING; FRAUD, DECEIT, AND/OR MISREPRESENTATION; UNFAIR BUSINESS PRACTICES; AND UNJUST ENRICHMENT**<br><br>JURY TRIAL DEMANDED |

1

**INTRODUCTION**

2      1.      Plaintiff Carlos Campos ("Plaintiff"), by and through his counsel, bring this class

3   action against Defendants Haleon US Inc. and Alacer Corp. (collectively, "Defendants"), to seek

4   redress for Defendants' deceptive, unlawful, and unfair labeling and marketing of Emergen-C

5   brand Vitamin C gummies.

6      2.      Consumers are increasingly health conscious and, as a result, many consumers

7   seek supplements high in Vitamin C. To capitalize on this trend, Defendants fortify the Emergen-

8   C gummy products with Vitamin C and prominently labels them as providing specific amounts of

9   Vitamin C per serving depending on the product, such as "750 mg Vitamin C" on the front label

10   of its Vitamin C gummy Product in the Strawberry, Lemon & Blueberry flavor. Consumers, in

11   turn, reasonably expect that each product will actually provide the amount of Vitamin C per

12   serving claimed on the front of the product package.

13      3.      The Food and Drug Administration ("FDA") prohibits front label claims about the

14   amount of Vitamin C when the content is less than the amount declared on the label. 21 C.F.R. §

15   101.9(g)(4)(i). Further, the FDA makes clear that "manufacturers are appropriately charged with

16   ensuring that the amounts present are at least 100 percent of the amounts declared throughout the

17   shelf life of their products" and, as a result, the "agency concludes that a dietary supplement not

18   meeting this requirement is misbranded under section 403(a)(1) of the act." 62 Fed. Reg. 49826-

19   01 at 49839 (Sept. 23, 1997).

20      4.      Although Defendants prominently labels its products as providing a specific

21   amount of Vitamin C per serving, the products, in truth, contain less Vitamin C than claimed

22   during their shelf life. Independent testing demonstrates that rather than having 750 grams of

23   Vitamin C per serving, for example, Defendants' Vitamin C gummy product in the Strawberry,

24   Lemon & Blueberry flavor product actually has only 409 milligrams (i.e., an overstatement by

25   approximately 183%).

26      5.      Indeed, Vitamin C, also known as ascorbic acid, is a highly unstable molecule that

27

28

readily degrades when exposed to light, oxygen, and heat.[1] Because Defendants package the Products in transparent bottles that expose the gummies to light during distribution, on retail shelves, and after purchase, the ascorbic acid in the Products degrades precipitously, reducing the total amount of Vitamin C found in the Products over time to an amount far less than the amount claimed even before the Products' expiration dates.

6.     Accordingly, the Vitamin C claims on the front of the package, such as "750mg Vitamin C" are unlawful and misbranded in violation of parallel state and federal laws because the products do not comply with regulatory requirements for making a Vitamin C claim.  21 C.F.R. § 101.9(g)(4)(i).

7.     In addition to being unlawful under 21 CFR §§ 101.9 and 101.13, Defendants' prominent protein claim on the front of the package also is likely to mislead reasonable consumers.  Consumers reasonably expect that Defendants' products will actually provide the full amount of Vitamin C per serving claimed on the front of the package. But Defendants' products do not do so. Indeed, the products provide nutritionally as little as 50% of their total Vitamin C quantity. That information was material to reasonable consumers.

8.     Defendants' unlawful and misleading Vitamin C claims caused Plaintiff and members of the class to pay a price premium for the Emergen-C Vitamin C gummy products.

**PARTIES**

9.     Plaintiff Carlos Campos is, and at all times alleged in this Class Action Complaint was, a resident of Crockett, California (Contra Costa County). He makes his permanent home in California and intends to remain in California.

10.     Haleon US Inc. (f/k/a GSK Consumer Health, Inc.) is a corporation existing under the laws of Delaware, having its principal place of business in New Jersey, and is registered to do

---

[1] Tikekar, Anantheswaran & LaBorde, "Ascorbic acid degradation in a model apple juice system and in apple juice during ultraviolet processing and storage," Journal of Food Science, 76:2 (2011); Hande Selen Burdurlu, Nuray Koca, Feryal Karadeniz, "Degradation of Vitamin C in citrus juice concentrates during storage," Journal of Food Engineering, 74:2 (2006); Mercali et al., "Study of vitamin C degradation in acerola pulp during ohmic and conventional heat treatment" J. Food Science and Technology, 47:91-95 (2012); Martí N., et al. Vitamin C and the role of citrus juices as functional food. Nat Prod Commun. 2009 May;4(5):677-700.

1   business in California. Haleon US Inc. manufactures, markets, advertises, and sells the Products

2   in California.

3       11.     Alacer Corp. is a corporation existing under the laws of Delaware, having its

4   principal place of business in New Jersey, and was formerly registered to do business in

5   California (the California branch entity has since merged with Pfizer, Inc., a third party not joined

6   in this action, and, on information and belief, Alacer has been acquired by Pfizer). Alacer Corp.

7   markets, advertises, and sells the Products in many U.S. states, including California.

8                                   **JURISDICTION AND VENUE**

9       12.     This Court has jurisdiction over the subject matter of this action pursuant to 28

10  U.S.C. § 1332(d)(2) because (1) there are 100 or more class members; (2) there is an aggregate

11  amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (3) Plaintiff and

12  Defendants are citizens of different states.

13      13.     The injuries, damages, and/or harm upon which this action is based occurred or

14  arose out of activities engaged in by Defendants within, affecting, and emanating from, the State

15  of California. Defendants regularly conduct and/or solicit business in, engage in other persistent

16  courses of conduct in, and/or derive substantial revenue from products provided to persons in the

17  State of California. Defendants have engaged, and continue to engage, in substantial and

18  continuous business practices in the State of California.

19      14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a

20  substantial part of the events or omissions giving rise to the claims occurred in the state of

21  California, including within this District.

22      15.     In accordance with California Civil Code Section 1780(d), Plaintiff concurrently

23  files herewith a declaration establishing that, at various times throughout the class period,

24  Plaintiff Campos purchased the Products from a Big Lots retail store on one or more occasions

25  during the last four years while in Contra Costa County, California. Plaintiff Campos' declaration

26  is attached hereto as Exhibit A.

27      16.     Plaintiff accordingly alleges that jurisdiction and venue are proper in this Court.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SUBSTANTIVE ALLEGATIONS**

**A.  Defendants' Vitamin C Gummy Products.**

17.    Defendants manufacture, distribute, market, advertise, and sell various nutritional supplement products in the United States, including vitamin gummy products under the brand name "Emergen-C." Many of these products have packaging that predominately, uniformly, and consistently states on the principal display panel of the product labels that they contain and provide a specified number of milligrams of Vitamin C per serving. Plaintiff has attached, as Exhibit B, a non-exhaustive list of Defendants' gummy products that make Vitamin C claims on the front of the product packages.[2] The products listed in Exhibit B, and any other gummy products from Defendants that claim a specific amount of Vitamin C on the front of its label will hereinafter be referred to as the "Products."

18.    The representations that the Products contain and provide a specific amount of Vitamin C per serving were uniformly communicated to Plaintiff and every other person who purchased any of the Products in California. The same or substantially similar product label has appeared on each Product during the entirety of the Class Period in the general form of the following example:

[REMAINDER OF PAGE INTENTIONALLY BLANK]

---

[2] The Products include all Emergen-C vitamin gummy products that make a front label claim about the quantity of Vitamin C of a serving size on the front label, including but not limited to: 1) 750 mg Vitamin C Gummies – Strawberry, Lemon, & Blueberry; 2) 750 mg Vitamin C Gummies – Orange, Tangerine, & Raspberry; 3) 750 mg Vitamin C Gummies – Tangerine, Watermelon & Sour Apple; 4) KIDZ 250 mg Vitamin C – Fruit Fiesta; 5) KIDZ 250 mg Vitamin C – Berry Bash; 6) KIDZ 250 mg Vitamin C – Fun-tastic Fruit; and 7) KIDZ Zero Sugar 250 mg Vitamin C – Sourlicious Fruit.

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15      19.    Throughout the Class Period, Defendants uniformly represented to consumers that

16  the 750 mg Vitamin C gummy Products contain "750 mg Vitamin C[.]"[3] This unequivocal

17  representation, along with the Emergen-C brand name, leads reasonable consumers to believe that

18  the Product in fact contains 750 mg of Vitamin C, which is a large dose, of Vitamin C.

19      20.    The back panel on the back of the Products uniformly and consistently provide for

20  a quantity of Vitamin C per serving. The back panels of the Products have appeared consistently

21  throughout the Class Period in the general form of the following example (from the Strawberry,

22  Lemon, & Blueberry flavored gummies):[4]

23
24
25

26  [3] Each 750 mg Vitamin C gummy Product, including, but not limited to, those in Orange, Tange-
rine, & Raspberry flavor and those in Tangerine, Watermelon, & Sour Apple flavor all include
27  identical representations on the front display and have similar labeling.

28  [4] The below is an example of the Products' label, including supplement facts and instructions for
use, that was obtained from the Emergen-C website.

## Emergen-C Gummies
### Dietary Supplement
#### Strawberry, Lemon, Blueberry Flavors

This is the most current labeling information and may differ from labels on product packaging. If there are any differences between this website labeling and product packaging labeling, this website labeling should be regarded as the most current.

**Directions:** Adults: Take three (3) gummies daily. Do not exceed suggested use. Not formulated for use in children.

# Supplement Facts
Serving Size 3 Gummies

| Amount Per Serving | | % Daily Value |
|---|---|---|
| Calories | 45 | |
| Total Carbohydrate | 11 g | 4%† |
| Total Sugars | 7 g | * |
| Includes 7 g Added Sugars | | 15%† |
| Vitamin C (as ascorbic acid) | 750 mg | 833% |
| Vitamin B₆ (as pyridoxine hydrochloride) | 1.5 mg | 88% |
| Vitamin B₁₂ (as cyanocobalamin) | 4 mcg | 167% |
| Biotin | 36 mcg | 120% |
| Zinc (as zinc sulfate) | 1.5 mg | 14% |
| Manganese (as manganese gluconate) | 0.38 mg | 17% |
| Sodium | 35 mg | 2% |

† Percent Daily Values are based on a 2,000 calorie diet.
* Daily Value not established.

**Other Ingredients:** Sugar, Glucose Syrup, Water. **Contains <2% of:** Citric Acid, Fruit & Vegetable Juice Concentrates (strawberry, purple carrot, maqui berry) (color and/or flavor), Lemon Oil, Natural Flavors, Pectin, Sodium Citrate, Turmeric (color).

As with any supplement, if you are pregnant, nursing, or taking medication, consult your doctor before use.

**Keep out of reach of children.**

Store at room temperature. Keep bottle tightly closed. Protect from moisture. Due to use of plant-based colors, gummy appearance may change over time. This does not alter the product potency.

Bottle sealed with printed foil under cap. Do Not Use if foil is torn.

Distributed by: Alacer Corp.
Carlisle, PA 17013

Consumer Line: 1.888.425.2362

21.    As described in detail below, Defendants' advertising and labeling of the Products as containing and providing specific amounts of Vitamin C per serving is unlawful, misleading, and intended to induce consumers to purchase the Products at a premium price, while ultimately failing to meet consumer expectations. The Products' front label protein claims are unlawful because the Products provide less than the amount of Vitamin C claimed on the front label. 21 C.F.R. § 101.9(g)(4)(i). The unlawful front label Vitamin C claims induced consumers to purchase the Products at a premium price. Had Defendants complied with FDA regulations and

not included a Vitamin C claim on the front label of their Products, reasonable consumers would not have purchased them or would have paid less for the Products.

22.    Defendants' prominent front label Vitamin C claims also deceived and misled reasonable consumers into believing that a serving of the Products will provide the grams of Vitamin C represented on the label, when that is not true. The Products provide significantly less Vitamin C than claimed because, among other things, the Products come in transparent bottles that expose them to light, which causes the Vitamin C to degrade even before a consumer buys the Product. The prominent Vitamin C claims on the front label allowed Defendants to charge a price premium. Had reasonable consumers been informed of the true amount of Vitamin C in the Products, they would not have purchased or would have paid less for the Products.

**B.  Consumer Demand for Vitamin C Products.**

23.    Many American consumers are health conscious and seek wholesome, natural foods to keep a healthy diet, so they routinely rely upon nutrition information when selecting and purchasing food items. As noted by FDA Commissioner Margaret Hamburg during an October 2009 media briefing, "[s]tudies show that consumers trust and believe the nutrition facts information and that many consumers use it to help them build a healthy diet."

24.    Vitamins are essential nutrients that are required for various biochemical and physiological processes in the body. Chambial S, Dwivedi S, Shukla KK, John PJ, Sharma P. Vitamin C in disease prevention and cure: an overview. Indian J Clin Biochem. 2013 Oct;28(4):314-28. It is well known that most of the vitamins cannot be synthesized in the body and hence their supplementation in diet is essential. *Id.*

25.    There are many health benefits of Vitamin C. Among other things, Vitamin C is an antioxidant, meaning it protects the body from various deleterious effects of free radicals, pollutants and toxins. Vitamin C has also been shown to regenerate other antioxidants within the body, including alpha-tocopherol (vitamin E). *See* Jacob RA, Sotoudeh G. Vitamin C function and status in chronic disease. Nutr. Clin. Care 2002 5:66-74.  In addition to its antioxidant functions, Vitamin C plays an important role in immune function. *Id*. Its most widely known

health benefit is in the prevention and relief of the common cold. Hemilä H, Chalker E. Vitamin C for preventing and treating the common cold. Cochrane Database Syst Rev. 2013;1.

26.    Consumers have grown increasingly concerned about their health. Vitamins have long come in tablet or pill form, but, in recent years, many manufacturers have launched vitamins in gummy form. Gummy vitamins are dietary supplements that are provided in chewable candy form. Unlike typical pill or tablet forms, gummy vitamins are appealing to both children and adults owing to their gummy candy-like taste and texture. One market research company estimates that the global gummy vitamin market is valued at $9.1 billion in 2022.[5]

**C.  Defendants' Products Do Not Contain the Amount of Vitamin C Claimed.**

27.    Although gummy vitamins taste better than regular pill-form vitamins, they have a shorter shelf life. The typical shelf life is two years.[6]

28.    Vitamin C, in particular, degrades quickly. The type of Vitamin C found in the Products is ascorbic acid. It is a highly unstable molecule that readily degrades when exposed to light, oxygen, and heat. Tikekar, Anantheswaran & LaBorde, "Ascorbic acid degradation in a model apple juice system and in apple juice during ultraviolet processing and storage," Journal of Food Science, 76:2 (2011); Hande Selen Burdurlu, Nuray Koca, Feryal Karadeniz, "Degradation of Vitamin C in citrus juice concentrates during storage," Journal of Food Engineering, 74:2 (2006). Vitamin C is unstable even at room temperature. Pavlovska & Tanevska, "Influence of temperature and humidity on the degradation process of ascorbic acid in Vitamin C chewable tablets," Journal of Thermal Analysis and Calorimetry, 111 (2013).

29.    The design of the Products makes it such that exposure light and heat is inevitable even before a consumer purchases the Products. This means that Vitamin C degrades before a consumer purchases the Products. For instance, the Products come in transparent bottles that expose the gummies to light during distribution and on retail shelves. Similarly, significant, often

---

[5] https://www.alliedmarketresearch.com/gummy-vitamins-market-A06064#:~:text=The%20global%20gummy%20vitamins%20market,variety%20of%20vita-mins%20and%20minerals.

[6] https://www.healthline.com/health/food-nutrition/do-vitamins-expire#average-shelf-life; https://www.naturemade.com/blogs/health-articles/do-multivitamins-expire.

unabated, heat exposure can occur during ordinary shipping, handling, and display of the Products.

30.     Vitamin C continues to degrade once a consumer buys a Product. Light exposure is inevitable, again, because the Products come in transparent bottles. Further, consumers must open the bottles and expose them to light in order to consume the Products. When consumers open the lid of the Products, they also expose them to oxygen and humidity in the air. Because the Products are designed to be consumed over time, the Products are repeatedly exposed to light, oxygen, and humidity each time a consumer opens the lid. Every exposure to oxygen, light, and/or heat causes the Vitamin C in the Products to degrade, further reducing the total amount of Vitamin C in the Products.

31.     Although Defendants knew, or, at a minimum, should have known that the Vitamin C in their Products would degrade below the claimed amount before and after sale, Defendants failed to properly package the Products and/or give their distributors, retail partners, and/or consumers necessary care and handling instructions to ensure the Products maintained their advertised potency.

32.     For instance, many competing gummy vitamin products come in opaque bottles that significantly reduce the Products' exposure to light. Similarly, the few instructions that Defendants do include on the Products say nothing about heat or light exposure and only advise consumers to store the Products at room temperature and keep the lid tightly closed, but, as explained above, ascorbic acid degrades even at room temperature, and the transparent bottle allows any ambient light to enter, even if the lid is tightly closed in storage.

33.     The problem of Vitamin C degradation in the Products is not theoretical. It has been confirmed by independent laboratory testing, which found *these Products contain far less Vitamin C than claimed on the Products' labels* during their shelf life. In particular, independent laboratory testing indicated that a new bottle of 750 mg Emergen-C Vitamin C Gummies in Strawberry, Lemon & Blueberry flavor contained ***only 409 mg per serving***, even where the bottle was tested well before its expiration date. As a result, consumers receive a ***little over half*** of the Vitamin C claimed on the label. The claims regarding Vitamin C content on the Product labels

are, thus, false and misleading.

**D. <u>Federal and State Regulations Governing Labeling of Vitamin C Products.</u>**

34.    Identical federal and California laws regulate the content of the Product labels. The requirements of the Act, and its labeling regulations, including those set forth in 21 C.F.R. § 101 were adopted by the California legislature in the Sherman Food Drug & Cosmetic Law (the "Sherman Law"). The federal laws and regulations discussed below are applicable nationwide to all sales of dietary supplements. Additionally, none of the California laws sought to be enforced here imposes different requirements on the labeling of dietary supplements for sale in the United States.

35.    The Act, 21 U.S.C. § 343(a), and the Sherman Law, provides that a product is misbranded if "its labeling is false or misleading in any particular."

36.    Under the FDCA, the term misleading is a term of art that covers labels that are technically true, but are likely to deceive consumers. Under the FDCA, if any single representation on the labeling is false or misleading, the entire food is misbranded, and no other statement in the labeling can cure a misleading statement.

37.    FDA regulations define Class I nutrients any "added nutrient in [a] fortified or fabricated food." 21 C.F.R. § 101.9(g)(3). The Products are fortified with Vitamin C, and Vitamin C is not naturally occurring in the gummies. Vitamin C is, thus, a Class I nutrient in the Products.

38.    Section 101.9(g)(4)(i), in turn, provides that "[a] food with a label declaration of a vitamin… shall be deemed to be misbranded under section 403(a) of the FDCA unless it meets the following requirements: (i) When a vitamin, mineral, protein, or dietary fiber meets the definition of a Class I nutrient, the nutrient content of the composite must be formulated to be at least equal to the value for that nutrient declared on the label."

39.    FDA further makes clear that "manufacturers are appropriately charged with ensuring that the amounts present are at least 100 percent of the amounts declared throughout the shelf life of their products." 62 Fed. Reg. 49826-01 at 49839 (Sept. 23, 1997). The agency has found that "[b]ecause the degradation is foreseeable, FDA expects that manufacturers will take it into account when fabricating dietary supplements." *Id*.  As a result, the "agency concludes that a

dietary supplement not meeting this requirement is misbranded under section 403(a)(1) of the act." *Id.*

40.     Similarly, 21 C.F.R. § 101.13(i)(3) prohibits manufacturers from making a claim on the front of a product's package about the "amount or percentage of a nutrient," such as protein, if the statement is "false or misleading in any respect." If it is, then "it may not be made on the label." 21 C.F.R. § 101.13(b). This is true even if the same amount appears in the nutrition facts panel. 21 C.F.R. § 101.13(c). Since the Products have less Vitamin C than claimed on the label, the Vitamin C front label claim is false and misleading and it was not permitted to be on the front label.

41.     The Products are misbranded and the Vitamin C claims on the front label are unlawful because the Vitamin C content of the Products is less than the value of Vitamin C declared on the Products' labels, which violates 21 C.F.R. § 101.9(g)(4)(i).

42.     Defendants' marketing, advertising, and sale of the Products violates the false advertising provisions of the Sherman Law (California Health & Safety Code § 110390, *et seq.*), including but not limited to:

    a.   Section 110390 *et seq.*, which makes it unlawful to disseminate false or misleading food advertisements that include statements on products and product packaging or labeling or any other medium used to directly or indirectly induce the purchase of a food product;

    b.   Section 110395, which makes it unlawful to manufacture, sell, deliver, hold or offer to sell any falsely or misleadingly advertised food; and

    c.   Sections 110398 and 110400, which make it unlawful to advertise misbranded food or to deliver or proffer for delivery any food that has been falsely or misleadingly advertised.

43.     Defendants' marketing, advertising, and sale of the Products violates the misbranding provisions of the Sherman Law (California Health & Safety Code § 110660, *et seq.*), including but not limited to:

      a.  Section 110665 (a food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in 21 U.S.C. Sec. 403(q) (21 U.S.C. Sec. 343(q));

      b.  Section 110705 (a food is misbranded if words, statements and other information required by the Sherman Law to appear food labeling is either missing or not sufficiently conspicuous);

      c.  Section 110760, which makes it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded;

      d.  Section 110765, which makes it unlawful for any person to misbrand any food; and

      e.  Section 110770, which makes it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food.

44.    Defendants have violated 21 U.S.C. § 343(a), and the standards set by FDA regulations, including but not limited to 21 C.F.R. § 101.9(g)(4)(i), which have been incorporated by reference in the Sherman Law, by fortifying their products and misleading consumers with claims about the quantity of Vitamin C on the front label.

45.    A reasonable consumer would expect that the Products provide what Defendants identify them to provide on the labels and that the labels would not be contrary to the policies or regulations of the State of California and/or the FDA. For example, a reasonable consumer would expect that when Defendants label the Products as containing, for example, "750mg Vitamin C" as Defendants claim on the Strawberry, Lemon & Blueberry flavor, it would provide 750 milligrams of Vitamin C per serving. Consumers have no idea that the Products provide significantly less Vitamin C.

46.    Consumers lack the meaningful ability to test or independently ascertain the truth-fulness of Defendants' labeling claims, especially at the point of sale. Reasonable consumers, when they look at the front label of the Products, believe that the Products provide the amount of Vitamin C represented on the front label. Consumers would not know the true amount of Vitamin

C the Products provide merely by looking elsewhere on the product package. Its discovery requires investigation well beyond the grocery store aisle and laboratory testing. The average reasonable consumer had no reason to suspect that Defendants' representations on the packages were misleading. Therefore, consumers had no reason to investigate whether the Products actually do provide the amount of Vitamin C per serving that the labels claim they do and reasonably relied on Defendants' representations regarding the nature of the Products.

47.    Defendants intend and know that consumers will and do rely upon labeling statements in making their purchasing decisions. Label claims and other forms of advertising and marketing drive product sales, particularly if placed prominently on the front of product packaging, as Defendants have done with the claims on the Products that they contain and provide specific amounts of Vitamin C per serving.

**E.    Defendants Misleadingly Market the Products To Increase Profits and Gain a Competitive Edge.**

48.    In making unlawful, false, misleading, and deceptive representations, Defendants distinguish the Products from its competitors' products. Defendants knew and intended that consumers would purchase, and pay a premium for, products labeled with Vitamin C claims. By using this branding and marketing strategy, Defendants are stating that the Products are superior to, better than, and more nutritious and healthful than other products that do not make Vitamin C claims, or that do not mislead consumers about the amount of Vitamin C its products actually provide.

**F.    Defendants Intend to Continue to Market the Products as Containing More Vitamin C than the Products Actually Contain.**

49.    Because consumers pay a price premium for products that make Vitamin C claims, and also pay a premium for products that provide more Vitamin C, by labeling its Products with Vitamin C claims that overstate the amount of Vitamin C the Products provide, Defendants are able to both increase its sales and retain more profits.

50.    Defendants engaged in the practices complained of herein to further their private interests of: (i) increasing sales of the Products while decreasing the sales of competitors that do

not mislead consumers about the amount of Vitamin C in its products, and/or (ii) commanding a higher price for its Products because consumers will pay more for the Products due to consumers' demand for products with Vitamin C claims.

51.     The market for Vitamin C products is continuing to grow and expand, and because Defendants know consumers rely on representations about the number of milligrams of Vitamin C in products, Defendants have an incentive to continue to make such unlawful and misleading representations. In addition, other trends suggest that Defendants have no incentive to change their labeling practices.

52.     To capitalize on the growing market, Defendants continue to launch new product lines and flavors to diversify its portfolio to maintain its competitive edge. It is therefore likely that Defendants will continue to unlawfully and/or misleadingly advertise the Products regarding Vitamin C in the Products.

**G.  Plaintiff's Experience**

53.     Plaintiff purchased Emergen-C Vitamin C 750 mg gummies from a Big Lots retail store on one or more occasions during the last four years while in California. Plaintiff made his purchase after reading and relying on the truthfulness of the Product's label that represented these gummies contained "750 mg" of Vitamin C per serving. He believed the truth of each representation, i.e., that the product would actually provide the specific amount of Vitamin C claimed on the front labels. Had Defendants complied with the law and not made the Vitamin C claims on the front of its packages, he would not have been drawn to the Products and would not have purchased them. At a minimum, Plaintiff would have paid less for each Product. Similarly, had he seen that the product provided significantly less Vitamin C than claimed on the label, he would not have purchased the Products or, at a minimum, he would have paid less for them.

54.     Plaintiff continues to desire to purchase Vitamin C products, including those marketed and sold by Defendants, and would like to purchase gummy vitamin products that provide 750 milligrams of Vitamin C per serving. If the Products were reformulated to actually contain at least the amount of Vitamin C claimed on the front label for the entirety of their shelf life, Plaintiff would likely purchase them again in the future. Plaintiff regularly visits stores where

Defendants' products and other nutritional supplement and vitamin products are sold. Because Plaintiff does not know the formula for Defendants' Products, which can change over time, and cannot test whether the Products provide the amount of Vitamin C that is represented on the label without first purchasing the Products, Plaintiff will be unable to rely on Defendants' labels when shopping for Vitamin C products in the future absent an injunction that prohibits Defendants from mislabeling the Products. Plaintiff would also be forced to retest and/or reanalyze each Product at each time of purchase because a Products' ingredient list and labeling would not reveal any changes in the amount of Vitamin C, even if such changes took place. Plaintiff would also be forced to retest and/or reanalyze each Product at each time of consumption, because a Products' ingredient list and labeling would not reveal any changes in the amount of Vitamin C due to increased light and oxygen degradation at each discrete time of consumption. And because of Defendants' unlawful and misleading labels on the Products, Plaintiff cannot make informed choices between Vitamin C products offered by Defendants and Vitamin C products offered by other manufacturers, such as choices based on price and relative nutritional content.

55.     Plaintiff and members of the Class have been economically damaged by their purchase of the Products because the advertising for the Products was, and is, unfair, deceptive, and misleading under state law. The products are misbranded; therefore, the Products are worth less than what Plaintiff and members of the Class paid for them and/or Plaintiff and members of the Class did not receive what they reasonably intended to receive.

## CLASS ALLEGATIONS

56.     In addition to his individual claims, Plaintiff bring this class action lawsuit on behalf of himself and a proposed class and subclass of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, defined as follows:

**Class**

All persons who, between November 15, 2020 and the present, purchased the Products in the United States (the "Class").

**California Subclass**

All Class Members who purchased the Products in California (the "Subclass").

57.    This action has been brought and may properly be maintained as a class action against Defendants because there is a well-defined community of interest in the litigation and the proposed Class and Subclass are easily ascertainable.

58.    <u>Numerosity</u>: Plaintiff does not know the exact size of the Class and Subclass, but Plaintiff estimates each is composed of more than 5,000 persons. The persons in the Class and Subclass are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

59.    <u>Common Questions Predominate</u>: This action involves common questions of law and fact to the proposed Class and Subclass because each Class and Subclass member's claim derives from the same deceptive, unlawful, and/or unfair statements and omissions. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class and Subclass to recover.  The questions of law and fact common to the Class and Subclass include, but are not limited to, the following:

a.    Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are unlawful and/or misleading

b.    whether Defendants' actions violate federal and California laws invoked herein;

c.    Whether labeling the Products with a Vitamin C claim causes the Products to command a price premium in the market;

d.    Whether Defendants' front label Vitamin C claims are likely to deceive reasonable consumers;

e.    Whether representations regarding the number of milligrams of Vitamin C in the Products are material to a reasonable consumer;

f.    whether Defendants engaged in the alleged conduct knowingly, recklessly, or negligently;

g.    the amount of profits and revenues earned by Defendants as a result of the conduct;

h.   whether Class and Subclass members are entitled to restitution, injunctive, and other equitable relief and, if so, what is the nature (and amount) of such relief; and,

i.   whether Class and Subclass members are entitled to payment of actual, incidental, consequential, exemplary, and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

60.   <u>Typicality</u>: Plaintiff's claims are typical of the claims of other members of the Class and Subclass because, among other things, all such claims arise out of the same wrongful course of conduct in which Defendants engaged in violation of law as described herein. Further, the damages of each member of the Class was caused directly by Defendants' wrongful conduct in violation of the law as alleged herein.

61.   <u>Adequacy of Representation</u>: Plaintiff will fairly and adequately protect the interests of all Class and Subclass members because it is in his best interests to prosecute the claims alleged herein to obtain full compensation due to them for the misleading and illegal conduct of which they complain. Plaintiff also has no interests that are in conflict with, or antagonistic to, the interests of Class and Subclass members. Plaintiff has retained highly competent and experienced class action attorneys to represent their interests and that of the Class and Subclass. By prevailing on his own claims, Plaintiff will establish Defendants' liability to all Class and Subclass members. Plaintiff and his counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their fiduciary responsibilities to the Class and Subclass members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class and Subclass members.

62.   <u>Superiority</u>: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the proposed Class and Subclass will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of Class and Subclass members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a

single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class and Subclass may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

63. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

Plaintiff does not plead, and hereby disclaims, causes of action under the FDCA and regulations promulgated thereunder by the FDA. Plaintiff relies on the FDCA and FDA regulations only to the extent such laws and regulations have been separately enacted as state law or regulation or provide a predicate basis of liability under the state and common laws cited in the following causes of action.

## PLAINTIFF'S FIRST CAUSE OF ACTION
**(Violation of the Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.*)**
**On Behalf of Himself and the Subclass**

64. Plaintiff realleges and incorporates the previous paragraphs of this Class Action Complaint as if set forth herein.

65. Defendants' actions, representations, and conduct have violated, and continue to violate, the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

66. Plaintiff and other Subclass members are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

67. The Products that Plaintiff (and other similarly situated Subclass members) purchased from Defendants were "goods" within the meaning of California Civil Code § 1761(a).

68. Defendants' acts, practices, and omissions set forth in this Class Action Complaint led reasonable consumers to falsely believe that the Products actually provide the amount of

Vitamin C represented on the bottle, per serving, for the shelf life of the Products. By engaging in the actions, representations, and conduct set forth in this Class Action Complaint, Defendants have violated, and continue to violate, § 1770(a)(2), § 1770(a)(5), § 1770(a)(7), and § 1770(a)(9) of the CLRA. In violation of California Civil Code §1770(a)(2), Defendants' acts and practices constitute improper representations regarding the source, sponsorship, approval, or certification of the goods they sold. In violation of California Civil Code §1770(a)(5), Defendants' acts and practices constitute improper representations that the goods they sell have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which they do not have. In violation of California Civil Code §1770(a)(7), Defendants' acts and practices constitute improper representations that the goods it sells are of a particular standard, quality, or grade, when they are of another. In violation of California Civil Code §1770(a)(9), Defendants have advertised goods or services with intent not to sell them as advertised.

69.     Plaintiff requests that this Court enjoin Defendants from continuing to employ the unlawful methods, acts, and practices alleged herein pursuant to California Civil Code § 1780(a)(2).  If Defendants are not restrained from engaging in these types of practices in the future, Plaintiff and the other members of the Subclass will continue to suffer harm. Plaintiff and those similarly situated have no adequate remedy at law to stop Defendants' continuing practices.

70.     CLRA § 1782 NOTICE. On or about June 26, 2024, Plaintiff provided Defendants with notice and demand that Defendants correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and/or deceptive practices complained of herein. Despite receiving the aforementioned notice and demand, Defendants failed to do so. Among other things, Defendants failed to identify similarly situated customers, notify them of their right to correction, repair, replacement, or other remedy, and/or to provide that remedy. Accordingly, Plaintiff seeks, pursuant to California Civil Code § 1780(a)(3), on behalf of himself and those similarly situated, compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Defendants' acts and practices.

71.     Plaintiff also requests that this Court award costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

**PLAINTIFF'S SECOND CAUSE OF ACTION**
**(False Advertising, Business and Professions Code § 17500, *et seq.* ("FAL"))**
**On Behalf of Himself and the Subclass**

72.     Plaintiff realleges and incorporates by reference the previous paragraphs of this Class Action Complaint as if set forth herein.

73.     Beginning at an exact date unknown to Plaintiff, but within three (3) years preceding the filing of the Class Action Complaint, Defendants made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of the Products.

74.     Defendants made representations and statements (by omission and commission) regarding Vitamin C that led reasonable customers to believe that the Products did, in fact, provide the amount of Vitamin C claimed on each Product's label for the shelf life of each Product.

75.     Plaintiff and those similarly situated relied to their detriment on Defendants' false, misleading, and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth above. Had Plaintiff and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, refraining from purchasing the Products, or, at the very least, paying less for them.

76.     Defendants' acts and omissions are likely to deceive the general public.

77.     Defendants engaged in these false, misleading, and deceptive advertising and marketing practices to increase their profits. Accordingly, Defendants have engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code.

78.     The aforementioned practices, which Defendants used, and continue to use, to their significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendants' competitors, as well as injury to the general public.

79.     As a direct and proximate result of such actions, Plaintiff and the other Subclass members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive, and misleading advertising in an amount which will be proven

at trial, but which is in excess of the jurisdictional minimum of this Court.

80.    Plaintiff seeks, on behalf of himself and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendants from Plaintiff, the general public, or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon. Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiff makes the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in his other causes of action, in the event that such causes of action will not succeed. Plaintiff and the Class may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy at law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the FAL, because Plaintiff may not be able to establish each Subclass member's individualized understanding of Defendants' misleading representations as described in this Complaint, but the FAL does not require individualize proof of deception or injury by absent Class members. *See, e.g., Ries v. Ariz. Bevs. USA LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012) ("restitutionary relief under the UCL and FAL 'is available without individualized proof of deception, reliance, and injury.'"). In addition, Plaintiff and the Subclass may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if Plaintiff is unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the FAL imposes no such *mens rea* requirement and liability exists even if Defendants acted in good faith.

81.    Plaintiff seeks, on behalf of himself and those similarly situated, a declaration that the above-described practices constitute false, misleading, and deceptive advertising.

82.    Plaintiff seeks, on behalf of himself and those similarly situated, an injunction to prohibit Defendants from continuing to engage in the false, misleading, and deceptive advertising and marketing practices complained of herein. Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendants will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future

violations will require current and future consumers to repeatedly and continuously seek legal

redress in order to recover monies paid to Defendants to which they are not entitled. Plaintiff and

those similarly situated have no other adequate remedy at law to ensure future compliance with

the California Business and Professions Code alleged to have been violated herein.

**PLAINTIFF'S THIRD CAUSE OF ACTION**
**(Fraud, Deceit and/or Misrepresentation)**
**On Behalf of Himself and the Class**

83.    Plaintiff realleges and incorporate by reference the previous paragraphs of this

Class Action Complaint as if set forth herein.

84.    Defendants have fraudulently and deceptively informed Plaintiff that the Products

provide more milligrams of Vitamin C than they actually provide during their shelf life.

85.    These misrepresentations and omissions were known exclusively to, and actively

concealed by, Defendants, not reasonably known to Plaintiff, and material at the time they were

made. Defendants knew or should have known the composition of the Products, and that ascorbic

acid readily degrades when exposed to light, oxygen, and heat. Defendants therefore knew or

should have known that the Products did not contain or provide the amount of Vitamin C

represented on the label for their entire shelf life. Defendants' misrepresentations and omissions

concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether

to purchase Defendants' Products. In misleading Plaintiff and not so informing him, Defendants

breached their duty to him. Defendants also gained financially from, and as a result of, their

breach of their duty to consumers.

86.    Plaintiff and those similarly situated relied to his detriment on Defendants'

misrepresentations and fraudulent omissions. Had Plaintiff and those similarly situated been

adequately informed and not intentionally deceived by Defendants, they would have acted

differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of

the Products, or (iii) paying less for the Products.

87.    By and through such fraud, deceit, misrepresentations and/or omissions,

Defendants intended to induce Plaintiff and those similarly situated to alter their position to their

detriment. Specifically, Defendants fraudulently and deceptively induced Plaintiff and those

similarly situated to, without limitation, purchase the Products.

88.   Plaintiff and those similarly situated justifiably and reasonably relied on Defendants' misrepresentations and omissions, and, accordingly, were damaged by Defendants.

89.   As a direct and proximate result of Defendants' misrepresentations and/or omissions, Plaintiff and those similarly situated have suffered damages, including, without limitation, the amount they paid for the Products.

90.   Defendants' conduct as described herein was wilful and malicious and was designed to maximize Defendants' profits even though Defendants knew that it would cause loss and harm to Plaintiff and those similarly situated.

## PLAINTIFF'S FOURTH CAUSE OF ACTION
### (Unlawful, unfair, and fraudulent trade practices violation of Business and Professions Code § 17200, *et seq.* (the "UCL"))
### On Behalf of Himself and the Subclass

91.   Plaintiff realleges and incorporates by reference the previous paragraphs of this Class Action Complaint as if set forth herein.

92.   Within four (4) years preceding the filing of this lawsuit, and at all times mentioned herein, Defendants have engaged, and continue to engage, in unlawful, unfair, and fraudulent trade practices in California by engaging in the unlawful, unfair, and fraudulent business practices outlined in this complaint.

93.   In particular, Defendants have engaged, and continue to engage, in unlawful practices by, without limitation, violating the following state and federal laws: (i) the CLRA as described herein; (ii) the FAL as described herein; (iii) the advertising provisions of the Sherman Law (Article 3), including without limitation, California Health & Safety Code §§ 110390, 110395, 110398 and 110400; (iv) the misbranding provisions of the Sherman Law (Article 3), including without limitation, California Health & Safety Code §§ 110660, 110665, 110705, 110760, 110765, and 110770; and (v) federal laws regulating the advertising and branding of products containing added vitamins in particular, as found in 21 C.F.R. § 101.9(g)(4)(i), and other FDA regulations, which are incorporated into the Sherman Law (California Health & Safety Code §§ 110100(a), 110380, and 110505).

94.    In particular, Defendants have engaged, and continue to engage, in unfair and fraudulent practices by, without limitation, (i) unlawfully making a Vitamin C claim on the front of the package without complying with the regulatory requirements set forth in 21 C.F.R. § 101.9(g)(4)(i) and incorporated by reference by California's Sherman law; (ii) failing to provide appropriate storage instructions to reduce Vitamin C degradation; and (iii) misleading reasonable consumers regarding the quantity of Vitamin C in their Products..

95.    Plaintiff, and those similarly situated, relied to their detriment on Defendants' unlawful, unfair, and fraudulent business practices. Had Plaintiff and those similarly situated been adequately informed and not deceived by Defendants, they would have acted differently by, without limitation: (i) declining to purchase the Product, (ii) purchasing less of the Product, or (iii) paying less for the Product.

96.    Defendants' acts and omissions are likely to deceive the general public.

97.    Defendants engaged in these deceptive and unlawful practices to increase its profits.  Accordingly, Defendants have engaged in unlawful trade practices, as defined and prohibited by section 17200, *et seq.* of the California Business and Professions Code.

98.    The aforementioned practices, which Defendants have used to their significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendants' competitors as well as injury to the general public.

99.    As a direct and proximate result of such actions, Plaintiff, and the other Subclass members, have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiff and the Subclass members lost the amount they paid for the Products.

100.    As a direct and proximate result of such actions, Defendants have enjoyed, and continue to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

101.    The UCL provides for separate and independent cause of actions for "unlawful,"

"unfair," and "fraudulent" conduct. *See Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) ("Each of these three adjectives captures "a separate and distinct theory of liability.")

102.    Plaintiff and the Subclass lack an adequate alternative remedy at law to obtain relief with respect to their claims under the "unlawful" prong of the UCL. The "unlawful" prong of the UCL makes the violation of a statute or regulation actionable. None of Plaintiff's damages claims provide a remedy for the harm caused by violation of a statue or regulation itself, whereas the UCL provides a remedy through its "unlawful" prong. Plaintiff's damages causes of action provide remedies for harm caused by the deception of consumers, which is a different type of harm from the harm Plaintiff and Subclass members sustained as a result of the unlawful Vitamin C labelling. Indeed, the violation of a statue or regulation – alone – does not mean the act was deceptive. *See e.g.*, *Victor v. R.C. Bigelow, Inc.*, No. 13-cv-02976-WHO, 2014 U.S. Dist. LEXIS 203331, at *15 (N.D. Cal. July 18, 2014) ("The mere fact that a statement violates a regulation is insufficient to show that it is also misleading. Victor's argument would effectively render every violation of the "unlawful" prong of the UCL a violation of the "fraudulent" prong as well—an untenable result without any legal basis.") Therefore, even if the CLRA and Plaintiff's other fraud-based claims provide a remedy for harm that would also be subject to the fraud prong of the UCL, those causes of action do not provide a remedy for the harm sustained under the "unlawful" prong of the UCL. Plaintiff, therefore, does not have an alternative legal remedy for their "unlawful" prong claim.

103.    Plaintiff seeks, on behalf of himself and those similarly situated, equitable relief, including the restitution for the premium and/or full price that he or others paid to Defendants as a result of Defendants' conduct. Plaintiff and the Subclass lack an adequate alternate remedy at law to obtain such relief with respect to their "unlawfulness" claims in this UCL cause of action because the California Sherman Law does not provide a direct cause of action, so Plaintiff and the Subclass must allege those violations as predicate acts under the UCL to obtain relief.

104.    Plaintiff also seeks equitable relief, including restitution, with respect to his UCL "fraudulent" prong claims. Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiff makes the following allegations in this paragraph only hypothetically and as an alternative to any

contrary allegations in their other causes of action, in the event that such causes of action do not succeed. Plaintiff and the Subclass may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy of law, if the Court requires them to show class-wide reliance and materiality beyond the objective reasonable consumer standard applied under the UCL, because Plaintiff may not be able to establish each Subclass member's individualized understanding of Defendants' misleading representations as described in this Complaint, but the UCL does not require individualized proof of deception or injury by absent class members. *See, e.g., Stearns v Ticketmaster*, 655 F.3d 1013, 1020, 1023-25 (distinguishing, for purposes of CLRA claim, among class members for whom website representations may have been materially deficient, but requiring certification of UCL claim for entire class). In addition, Plaintiff and the Subclass may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if Plaintiff is unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the UCL imposes no such *mens rea* requirement and liability exists even if Defendants acted in good faith.

105.    Plaintiff seeks, on behalf of himself and those similarly situated, equitable relief, including restitution for the premium and/or the full price that they and others paid to Defendants as result of Defendants' conduct. Plaintiff and the Subclass lack an adequate remedy at law to obtain such relief with respect to their "unfairness" claims under the UCL, because there is no cause of action at law for "unfair" conduct. Plaintiff and the Subclass similarly lack an adequate remedy at law to obtain such relief with respect to their "unlawfulness" claims under the UCL cause of action because the Sherman Law and FDA regulations cited herein do not provide a direct cause of action, as explained above, so Plaintiff and the Subclass must allege those violations as predicate acts under the UCL to obtain relief.

106.    Plaintiff seeks, on behalf of those similarly situated, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

107.    Plaintiff seeks, on behalf of those similarly situated, an injunction to prohibit Defendants from continuing to engage in the deceptive and/or unlawful trade practices complained of herein. Such misconduct by Defendants, unless and until enjoined and restrained

by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendants will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which they were not entitled.  Plaintiff and those similarly situated have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

<u>**PLAINTIFF'S FIFTH CAUSE OF ACTION**</u>
**(Unjust Enrichment)**
**On Behalf of Himself and the Class**

108.    Plaintiff realleges and incorporates by reference the previous paragraphs of this Class Action Complaint as if set forth herein.

109.    Plaintiff and those similarly situated conferred benefits on Defendants by purchasing the Products.

110.    Defendants have been unjustly enriched in retaining the revenues from Plaintiff's and Class members' purchases of the Products, which retention is unjust and inequitable, because Defendants falsely represented that the Products contained specific amounts of Vitamin C per serving, while failing to disclose that the Products actually provided less protein than represented during their shelf life.

111.    Defendants engaged in these unjust practices to increase their profits to the detriment of Plaintiff and those similarly situated.

112.    Because Defendants' retention of the non-gratuitous benefit conferred on them by Plaintiff and Class members is unjust and inequitable, Defendants must pay restitution to Plaintiff and the Class members for its unjust enrichment, as ordered by the Court. Plaintiff and those similarly situated have no adequate remedy at law to obtain this restitution.

113.    Plaintiff, therefore, seeks an order requiring Defendants to make restitution to them and other members of the Class.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff, on behalf of himself and those similarly situated, respectfully

request that the Court enter judgment against Defendants as follows:

A.  Certification of the proposed Class, including appointment of Plaintiff's counsel as Class counsel;

B.  An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.  An award of compensatory damages in an amount to be determined at trial, except as to those causes of action where compensatory damages are not available by law;

D.  An award of statutory damages in an amount to be determined at trial, except as to those causes of action where compensatory damages are not available by law;

E.  An award of punitive damages in an amount to be determined at trial, except as to those causes of action where punitive damages are not available by law;

F.  An award of treble damages, except as to those causes of action where treble damages are not available by law;

G.  An award of restitution in an amount to be determined at trial;

H.  An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

I.  For reasonable attorney's fees and the costs of suit incurred; and

J.  For such further relief as this Court may deem just and proper;

## JURY TRIAL DEMANDED

Plaintiff hereby demand a trial by jury.

Dated: November 15, 2024                    **GUTRIDE SAFIER LLP**


                                            _/s/Seth A. Safier/_
                                            Seth A. Safier, Esq.
                                            Marie McCrary, Esq.
                                            Rajiv V. Thairani, Esq.
                                            100 Pine Street, Suite 1250
                                            San Francisco, CA 94111

# Exhibit A

I, Carlos S. Campos, declare:

1.      I am a Plaintiff in this action. If called upon to testify, I could and would competently testify to the matters contained herein based upon my personal knowledge.

2.      I submit this Declaration pursuant to California Code of Civil Procedure section 2215.5 and California Civil Code section 1780(d).

3.      As set forth in my complaint, I purchased the Emergen-C Vitamin C 750 mg gummies. I made this purchase in Contra Costa, California multiple times within the past four years.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Executed this 6th day of September 2024, in Crockett, California.


DocuSigned by:

ADB08AF4E5614BE...
Carlos S. Campos

DECLARATION RE CAL. CIV. CODE SECTION 1780(D) JURISDICTION